**Lynn J. FREEMAN, Appellee,**

v.

**LUPPES TRANSPORT COMPANY, INC., Employer, and Federated Insurance Company, Insurance Carrier, Appellants.**

No. 2–56146.

Supreme Court of Iowa.

March 19, 1975.

Hopkins, Bump & Huebner, Des Moines, for appellants.

Thomas L. McCullough, Sac City, for appellee.

Heard before MOORE, C. J., and RAWLINGS, UHLENHOPP, REYNOLDSON, and HARRIS, JJ.

UHLENHOPP, Justice.

The decision in this workmen's compensation appeal turns on whether the claimant established a causal connection as a matter of law between an injury on April 24, 1970, and subsequent disability.

Claimant Lynn J. Freeman leased his tractor-trailer combination to Luppes Transport Company to haul ammonia. He drove the truck himself. He received a percentage of the revenue which Luppes obtained for each trip. On April 24, 1970, when a wheel of the truck fell into a chuck hole on a consignee's premises at Pioneer, Iowa, claimant sustained a neck injury which was diagnosed as a strain of the cervical muscles. He reported the incident to Luppes the next day. He continued to work, but his neck hurt and he felt bad.

Also during this period, claimant was worried about his business. He owned three other trucks, which his employees operated, and he had difficulty finding reliable drivers. In addition, the government drafted his only son into the army on May 13, 1970. This upset claimant, and it left him without his son's help in the management of the business. These matters placed claimant under considerable stress and tension.

In May 1970, claimant took four neck treatments by a chiropractor, but obtained no relief. In June and July he took four treatments by an osteopath, likewise without success.

Sometime in June 1970, claimant's head began to turn to the right, involuntarily and spasmodically. On June 29, 1970, he stopped driving his truck for Luppes and did not drive it thereafter. He consulted a local medical doctor, who referred him to Dr. Carroll A. Brown, a neurological surgeon. In early July 1970, claimant entered a hospital for a three-day period for examination by Dr. Brown. Dr. Brown diagnosed claimant's trouble at that time as "Spasmodic Torticollis, acute, right, cause unknown."

Torticollis is involuntary turning of the head. The doctors who testified agreed that the cause of torticollis is not known. Some experts think it may be a psychogenic problem while others think it may be physiological—a lesion on the stem of the brain.

Dr. Brown was of the opinion that claimant's torticollis was "entirely functional." He recommended psychiatric evaluation and prescribed a relaxant-tranquilizer combination. In connection with the subsequent workmen's compensation proceeding, he testified:

Q. Doctor, could you explain how the spasm of the neck is thus connected with the truck episode, the jars and the injury to the neck? . . . A. This question cannot be adequately answered from a purely medical standpoint on the basis of my knowledge as far as we know about torticollis, of which this man suffers. There is no pure proven basis for why these people develop this condition. Medical experience has been of the belief that it is mixed between a nervous state and an unknown type of organic disease, so that I do not have knowledge of a specific type of injury that could precipitate this; except in the circumstances of this man, age 52, with a normal background in his past. The specific injury that led to this disability I have to consider that the precipitating factor was the accident, and I had a hunch, but it is not more than a medical possibility that this man was driving an ammonia truck for the first time and was quite worried by the danger of this truck, and possibly there was the worry of this driving associated with something else that triggered the mechanism. That is the best answer. I don't feel this is the medical answer of fact, but merely rather of supposition.

He also testified:

Q. Your recommendation that he undergo psychiatric evaluation; is this on the basis, Doctor, that you feel this is primarily a psychogenic malady as opposed to a physiological problem? A. Yes, sir, I do.

Q. I believe you have stated that you based your opinion primarily on stress and tension this man was under? A. That was my opinion.

In September 1970, claimant's local medical doctor referred him to University Hospitals in Iowa City. Physicians there diagnosed spasmodic torticollis "on functional basis." Their impression was that no organic lesion existed. Their physiological and psychological report is extensive. In summary they reported:

Pt's problem takes place in context of son being drafted and declining to assume his father's business. Pt has become totally incapacitated, so that one wonders if there is an unconscious attempt to get son out of army and back into the company. Can't prove it, tho.

Symptoms disappear when Pt relaxed, return when concerning with business. He has virtually cut himself out of his own business.

No significant signs of depression. Some anxiety. Mildly circumstantial. Really feels strongly re son's absence. Nothing to suggest OBS.

Those physicians recommended:

1. Psychotherapy with Dr. Bertenmann or Dr. Mead [psychiatrists] in Omaha to make clear dynamics.

2. Valium 10 mg. qid—if not too sedating.

3. Exercises for placebo effect and symptomatic Rx.

4. Strong urging to return to driving and reassume responsibility for company. Have LMD help with this.

On October 15, 1970, while driving his pickup truck near his home, claimant had an accident and sustained serious abdominal injuries. He was hospitalized as a result for 29 days.

On October 21, 1970, Luppes' insurance carrier filed two documents with the Iowa Industrial Commissioner, an Employer's First Report of Injury and a Memorandum of Agreement. The former bore Luppes' signature and the date August 28, 1970; stated that the injury occurred on April 8, 1970 [sic], that disability began June 29, 1970, and that claimant was still off work;

described the injury as "Unloading anhydrous, from trailer, slipped and fell, injuring back"; and had nothing in the space after the words, "Probable length of disability". The Memorandum of Agreement bore the signatures of Luppes and its insurance carrier and the date October 20, 1970; stated that the injury occurred on April 24, 1970, and disability began June 30, 1970; and described the cause and place of the injury as "unloading anhydrous from trailer, fell, Pioneer, Iowa," and the injury itself as "neck injury". The Memorandum of Agreement had the word "UNKNOWN" after the words, "If temporary disability, probable duration thereof", and the figure "$40.00" after the words, "Temporary disability and healing period weekly rate". It had nothing in the space after the words, "Permanent partial disability and permanent total disability weekly rate". The commissioner approved the Memorandum of Agreement.

On November 12, 1970, Luppes' insurance carrier filed with the commissioner an Employers Report of Workmen's Compensation Benefit Payments Made. This document stated after the words, "Basis of Settlement and Payments Made", that the date of injury was April 24, 1970, that disability began on June 30 and ended October 26, 1970, that the date of the compensation draft was October 20, 1970, and that the compensation paid for temporary disability or healing period was $680 (17 weeks times $40) and the medical expense paid was $325.82. The document had nothing in the spaces after the words, "Permanent Partial Disability" and "Permanent Total Disability". Attached to the document was a receipt for claimant's signature. Claimant did not sign the receipt, but the insurance carrier did pay the sums stated.

After his local medical doctor moved away, claimant went to another local doctor who referred him to the Mayo Clinic. Dr. H. J. Svien practices in that clinic and has made a study of torticollis. He first examined claimant on January 13, 1971. In connection with the history, claimant related the injury to his neck on April 24, 1970. Dr. Svien diagnosed claimant's condition at the time of examination as spasmodic torticollis and treated claimant over a period of time, using low-voltage electricity in the inner ear. Claimant testified that he got help and was not as bad as formerly.

Luppes and its insurance carrier introduced Dr. Svien's testimony on the question of the connection between the injury of April 24, 1970, and the torticollis. Dr. Svien testified on direct examination:

Q. Do you have an opinion, Doctor, within a reasonable degree of medical certainty as to whether trauma to the neck such as was described in the history given, caused or produced the symptoms of torticollis? A. I have not been able to correlate the injury to the neck as a cause of spasmodic torticollis.

Also:

Q. Then I will ask you this, Doctor, in your opinion was the incident with the truck that the Claimant gave you by way of history, in your opinion related to this spasmodic torticollis? A. As I mentioned, I have not been able to correlate the incident of the spine injury with the cause of torticollis.

Claimant's attorney thoroughly cross-examined Dr. Svien, but the doctor adhered to his view. In his cross-examination he stated that medical science does not know the cause of torticollis and then testified:

Q. And along the same lines then I presume in your mind and your judgment it is impossible to say absolutely or definitely one way or another on this question of this connection between trauma and spasmodic torticollis? A. I think I answered that once before.

Q. All right, if you did I will withdraw the question. A. I cannot say categorically that it is impossible for it to happen, all I can say is from what I know about the condition, having seen probably more torticollis than anyone in the world—and I don't mean that in a pomp-

ous way, that I do not find any evidence to make me believe that injury causes spasmodic torticollis.

Q. Can you rule it out, Doctor? . . A. I told you that I can't tell you that it couldn't possibly. We are dealing with abstractions here in this sense that we don't know the cause of torticollis. I am merely telling you what my opinion is from a considerable work with these patients. No, I can't tell you for sure that tomorrow will be coming. I am pretty sure it is, but I can't tell you for sure that it is coming.

Also on January 13, 1971, claimant's attorney filed with the Industrial Commissioner claimant's Application for Review-Reopening. In it claimant stated that he received a personal injury arising out of and in the course of his employment at Pioneer, Iowa, on April 24, 1970, when a truck wheel fell in a hole snapping his neck, that he is totally and permanently disabled because of the neck injury, that Luppes or its insurance carrier paid weekly compensation of $732, and that claimant does not know what the dispute is in the case—"The insurance company refuses to make any payments so presumably it is on the question of the degree of permanent disability."

Section 86.34 of the Code authorizes review-reopening proceedings and permits a workman to seek an extension or increase of payments and an employer to seek a reduction or termination of them, in accordance with the facts as to the workman's condition, notwithstanding a previous arbitration award or memorandum of agreement which is uncommuted. The section provides in pertinent part:

Any award for payments or agreement for settlement made under this chapter where the amount has not been commuted, may be reviewed by the industrial commissioner or a deputy commissioner at the request of the employer or of the employee at any time within three years from the date of the last payment of compensation made under such award or agreement, and if on such review the commissioner finds the condition of the employee warrants such action, he may end, diminish, or increase the compensation so awarded or agreed upon.

At a hearing on the application held by a deputy industrial commissioner, claimant and his wife testified and the parties introduced exhibits and physicians' testimony, portions of which we have quoted. The deputy commissioner found that on April 24, 1970, claimant sustained an injury arising out of and in the course of his employment, that claimant was fully compensated therefor, and that claimant failed to sustain his burden of proof the spasmodic torticollis was causally related to the injury of April 24, 1970. The deputy commissioner therefore dismissed the application. Claimant appealed to district court which, on the basis of the Memorandum of Agreement, reversed the decision and remanded the proceeding to the commissioner to make a determination of total and permanent disability. Luppes and its insurance carrier appealed to this court.

Claimant established beyond question that he sustained an injury on April 24, 1970, and that he started having spasmodic torticollis in June 1970. We will assume arguendo that the torticollis totally and permanently disabled him. Unquestionably such disability flowed from the torticollis; hence the cause of the torticollis and of the disability is actually the same. Was the injury of April 24, 1970, a proximate cause of the torticollis disability?

We first approach the case without reference to the Memorandum of Agreement. Did the evidence before the deputy commissioner require him to find claimant sustained his burden as a matter of law that the injury of April 24, 1970, caused the torticollis disability? If so, we need not consider the Memorandum. But if not, did the Memorandum of Agreement finally determine that the injury of April 24, 1970, caused the torticollis disability, as the trial court held and claimant contends?

I. *Cause of Torticollis Disability—Law or Fact?* At the outset we repeat the general principles which apply. This court stated in Wagner v. Otis Radio & Electric Co., 254 Iowa 990, 993, 119 N.W.2d 751, 752:

> We have repeatedly construed these [workmen's compensation] provisions as making the commissioner's findings of fact conclusive on appeal where the evidence is in dispute or reasonable minds may differ on the inferences fairly to be drawn from the facts. Such findings have the standing of a jury verdict. That is, if the evidence presents a question which should be submitted to a jury, if trial were to a jury, then the court is bound by the commissioner's findings.

In Merchant v. SMB Stage Lines, 172 N.W.2d 804, 807 (Iowa):

> The commissioner, not the court, weighs the evidence, and his findings will be broadly and liberally construed to uphold rather than defeat his decision.

And in Poole v. Hallett Const. Co., 261 Iowa 481, 484, 154 N.W.2d 716, 718:

> It is the duty of the commissioner to determine where the preponderance of evidence lies in compensation proceedings. It is not often a party who had the burden of proof establishes his claim as a matter of law.

■ We have carefully reviewed the testimony and exhibits, including the medical evidence, in light of these principles. When we do so, we conclude that a trial court could not decide the causation issue as a matter of law and would have to submit it to a jury. This means that we cannot overturn the deputy commissioner's fact finding that claimant did not sustain his burden of proving the torticollis disability was causally related to the injury of April 24, 1970. A decision involving somewhat similar conflicting medical testimony is Holmes v. Bruce Motor Freight, Inc., 215 N.W.2d 296 (Iowa). We thus turn to the effect of the Memorandum of Agreement.

II. *Effect of Memorandum of Agreement.* The trial court was of opinion that the Memorandum of Agreement foreclosed inquiry into the cause of the torticollis disability, as claimant contends. What does a Memorandum of Agreement finally settle?

■ Under our workmen's compensation act, a workman must establish three principal elements: (1) an employer-employee relationship at the time of the injury, Hassebroch v. Weaver Const. Co., 246 Iowa 622, 67 N.W.2d 549, (2) an injury arising out of and in the course of the employment, McClure v. Union County, 188 N.W.2d 283 (Iowa); Code 1973, § 85.3, and (3) the disability (or death) proximately caused by the injury, Poole v. Hallett Const. Co., 261 Iowa 481, 154 N.W.2d 716 (original proceedings for compensation); Deaver v. Armstrong Rubber Co., 170 N.W.2d 455 (Iowa) (review-reopening proceedings).

A line of Iowa decisions deals with the effect of a memorandum of agreement upon the workman's obligation to establish the elements of his claim. Trenhaile v. Quaker Oats Co., 228 Iowa 711, 292 N.W. 799; Fickbohm v. Ryal Miller Chevrolet Co., 228 Iowa 919, 292 N.W. 801; Dietz v. Farmers Elevator Co., 229 Iowa 335, 294 N.W. 571; Tebbs v. Denmark Light & Telephone Corp., 230 Iowa 1173, 300 N.W. 328; Dietz v. Pioneer Hi-Bred Co., 231 Iowa 220, 1 N.W.2d 235; Whitters & Sons, Inc. v. Karr, 180 N.W.2d 444 (Iowa).

In Trenhaile, the workman operated a Quaker Oats grain elevator and sustained an injury. He and Quaker Oats entered into a memorandum of agreement which recognized that an employer-employee relationship existed at the time of the injury and which provided for weekly compensation. The workman returned to work. Subsequently the workman sought review-reopening, claiming that the original injury caused permanent disability. Twenty-three months after the parties entered into the memorandum of agreement and 26 days before the statute of limitations would run out, Quaker Oats filed a substituted answer

averring that the workman was a manager and denying that an employer-employee relationship existed at the time the injury occurred. This court held that Quaker Oats was estopped to deny the admission of the employer-employee relationship recognized by the memorandum. The memorandum thus finally determined the first element, the employer-employee relationship at the time the injury occurred.

Fickbohm built upon Trenhaile. In Fickbohm the workman sustained burns while working on a motor for Ryal Miller. The parties entered into a memorandum of agreement and Ryal Miller's insurance carrier paid compensation. Later the workman's dependents sought to reopen, claiming that the workman died as a result of the injury. Ryal Miller contended that the workman disobeyed orders by leaving the battery connected when working on the motor, hence the original injury did not "arise out of" the employment. This court said, "The deputy commissioner in his opinion held, and we are disposed to agree, that the agreement not being set aside or attacked on the ground of mutual mistake or fraud remains in the record unchallenged as a binding and enforceable agreement." 228 Iowa at 925, 292 N.W. at 803. Thus the memorandum determined the second element of a compensation claim, an injury arising out of and in the course of the employment.

Dietz v. Farmers Elevator is very similar to Trenhaile except that the Elevator asked to have the memorandum set aside for fraud or mistake. The Elevator adduced no proof of those grounds, however, and this court therefore denied it relief.

Tebbs involved a memorandum of agreement between the workman and Denmark Light & Telephone Corporation for payments to the workman for a specified time, and a subsequent original action in district court by a dependent of the workman to obtain judgment for compensation after the workman's death. This court held the dependent could not obtain judgment on the memorandum " 'which is not in strict accordance with the terms and conditions therein.' " 230 Iowa at 1181, 300 N.W. at 332. The court also held the dependent would not be entitled to relief without a finding of fact by the commissioner that the death resulted from the original injury, a matter not determined by the memorandum. The court quoted the commissioner as to the effect of a memorandum:

"The department has heretofore, for many years last past, interpreted the memorandum of agreement as settling two propositions, the employment contractual relation and the injury as one arising out of and in the course of the employment, *leaving the question with reference to extent of disability open for adjustment in accordance with the facts, providing that application therefor is made within the period of the statute of limitations as provided by section 1457* [Code 1939]." 230 Iowa at 1176, 300 N.W. at 329 (italics added).

Dietz v. Pioneer involved an attempt by Pioneer and its insurance carrier to set aside a memorandum of agreement on the ground of fraud or mistake—that the workman was in fact an independent contractor at the time the injury occurred. This court held that the memorandum settled the question of the employer-employee relationship, quoting the Tebbs opinion, that Pioneer had not proved fraud or mistake, and that the memorandum should stand.

Whitters & Sons also involved an attempt to set aside a memorandum on the ground of fraud or mistake. The insurance carrier filed a memorandum of agreement and made payments. Later it sought to avoid the memorandum on the ground that the workman had left his place of employment at the time the injury occurred. But the record contained no evidence of fraud or mistake, and this court upheld the memorandum. The case involved the second element, an injury arising out of and in the course of the employment.

▮▮▮▮ Thus the decisions make clear that unless a memorandum of agreement is set

aside on such grounds as fraud or mistake, it settles the first element of liability, that an employer-employee relationship existed at the time of the injury. In the case at bar this means Luppes and its insurance carrier could not now successfully contend that claimant, in hauling ammonia in his truck for a percentage of the revenue, was an independent contractor at the time of the injury on April 24, 1970. See Hassebroch v. Weaver Const. Co., 246 Iowa 622, 67 N.W.2d 549. A memorandum of agreement also settles the second element of liability, that the injury arose out of and in the course of the employment. Hence Luppes and its carrier could not successfully contend that the injury of April 24, 1970, occurred while claimant was on a mission of his own. But since the compensation was not commuted, the third element, the disability, remains open in accordance with "the condition of the employee" notwithstanding "an award for payments or agreement," by virtue of § 86.34 of the Code and the language in Tebbs v. Denmark Light & Telephone Corp., 230 Iowa 1173, 1176, 300 N.W. 328, 329 (" 'leaving the question with reference to extent of disability open for adjustment in accordance with the facts' ").

A decision which arrives at the result just stated is Wagner v. Otis Radio & Electric Co., 254 Iowa 990, 119 N.W.2d 751. The workman injured his back at work on November 4, 1957, and never worked again. On July 22, 1958, a memorandum of agreement was filed, under which Otis's insurance carrier paid compensation of $832 (26 weeks times $32). On November 12, 1958, the workman applied for review-reopening, claiming that he suffered greater back disability than he had been compensated for. After a hearing, the deputy commissioner denied the application on the ground the workman did not prove the injury of November 4, 1957, caused the greater back disability. Notwithstanding the memorandum of agreement, this court regarded the issue of the greater back disability to be open for the deputy commissioner and the question to be one of proof—whether, as shown by the evidence, the injury on November 4, 1957, caused the workman's disability. This court considered the evidence on the issue, found it to present a fact question, and upheld the deputy commissioner's decision. The case is close to the present one.

 We thus hold that the Memorandum of Agreement in this case prohibits inquiry as to whether an employer-employee relationship existed when the injury occurred on April 24, 1970, and as to whether the injury on that date arose out of and in the course of the employment. We further hold, however, that the Memorandum does not foreclose inquiry into the question of whether the injury of April 4, 1970, caused claimant's torticollis disability. Since the deputy commissioner found against claimant on that question and since that question is a fact issue under the evidence here, we uphold his decision and overturn the judgment of the district court.

Reversed.